IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TONYA R. WOMACK,

        Plaintiff,

   vs.                              Case No. 10-2312-SAC

DELAWARE HIGHLANDS
AL SERVICES PROVIDER, LLC,

        Defendant.


MEMORANDUM AND ORDER

      The case comes before the court on the defendant's motion for summary judgment.  (Dk. 50).  Tonya R. Womack worked full-time as a nurse at the assisted living facility, Delaware Highlands AL Services Provider, LLC ("Delaware"), for approximately six months until her termination.  While her former employer asserts the plaintiff's termination was due to misconduct, insubordination and breaches of confidentiality, the plaintiff claims that she opposed age discriminatory comments and actions by her supervisor Ms. Dawn Gates and then was terminated in retaliation.  Delaware argues for summary judgment because the plaintiff cannot show a prima facie case of retaliation or pretext in the employer's proffered non-discriminatory reasons for termination.  The defendant again seeks summary judgment on the additional ground that the plaintiff did not timely file administrative claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, or the Kanas Age Discrimination in

Employment Act ("KADEA"), K.S.A. § 44-1111 *et seq.*  The defendant fails to justify the court revisiting the prior summary judgment ruling, and controverted questions of material fact preclude summary judgment on the other grounds.

**Timely Administrative Filings Under KADEA and ADEA**

The defendant Delaware filed a motion dismiss challenging the plaintiff's failure to timely file her administrative claims for retaliatory discharge under both state and federal law.  (Dk. 15).  Because both parties submitted matters outside of the pleadings, the court converted the motion to one seeking summary judgment and extended the parties more time for filing additional material.  (Dk. 25, p. 3).  Both parties submitted additional material that they regarded as appropriate for the court to consider in its summary judgment ruling.  (Dks. 26 and 27).[1]

---

[1] To its filing, Delaware attached and identified as Exhibit A what it represented to be the plaintiff's letter dated "2/22/10" found in the EEOC file.  (Dk. 27, Ex. A).  Delaware discussed the contents of this letter in proof of the plaintiff's actions and even quoted from it in proof of the plaintiff's knowledge.  (Dk. 27, p. 5).  To her recent memorandum in opposition to summary judgment, the plaintiff attaches the very same letter as part of her Exhibit H which appears to be her EEOC retaliation charge with this accompanying letter that was faxed to the EEOC on February 22, 2010.  (Dk. 57-8).  What the court cannot understand is that Delaware in its recent reply brief now regards that same letter as "unauthenticated" and "inadmissible hearsay" and asks the court to strike the letter and disregard it.  (Dk. 64, pp. 22-26).  Having relied on that same letter and its contents as proper and appropriate in earlier summary judgment proceedings on the same issue and having provided the court with no stated reasons for changing its position,

The Honorable Judge Brown denied the defendant's converted summary judgment motion finding:

> In the case at hand, Womack called the EEOC to schedule an appointment prior to the limitations period running. She was told the investigator assigned to her case had retired, and told to call back in three months. She asked what she needed to do regarding amending her complaint, and, according to her testimony, was told to wait until after the new year. Even if she did not inquire into amending her complaint, it is clear that more than 60 days passed before Womack's case was assigned a new investigator. Womack relied on the representations of the EEOC, and did not call back until after the new year. A jury could find that Womack did not pursue her claims within the limitations period because she relied on the EEOC representation. By the time Womack was able to meet with a new investigator, the limitations period had expired. Womack was not sleeping on her rights or failing to act diligently. Drawing all reasonable inferences in favor of Womack, a jury could find Womack was lulled into inaction by the statements of the EEOC.
>
> Additionally, the defendant in this case has not shown any prejudice from allowing plaintiff to proceed with her claim. Womack is entitled to equitable tolling, and should be allowed to include her claims for retaliation in her complaint.

(Dk. 28, pp. 5-6).  Delaware's pending motion for summary judgment does not mention its prior converted motion for summary judgment or Judge Brown's prior ruling on this issue.  Delaware does not address or explain how its current motion presents something new for the court to consider.  It does not identify any facts as newly discovered or legal arguments as newly added.  Indeed, Delaware makes no effort to justify why it believes a court should revisit or would revisit here the prior summary judgment ruling

---

Delaware has waived its objection to the court's consideration of this letter in the present summary judgment proceedings.

simply because the movant chooses to file what is essentially the same motion.  Offering the court no reason for a second bite at the apple, the court summarily rejects Delaware's motion for summary judgment on the timeliness of the administrative charges.[2]

**Summary Judgment Standards**

Rule 56 authorizes a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it would affect the outcome of a claim or defense under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[T]he dispute about a material fact is 'genuine,' . . ., if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

---

[2] In its reply memorandum, Delaware does refer in passing to the court's prior summary judgment ruling on this issue.  It argues that the court had failed to distinguish the different time period governing the state KADEA claim and that the plaintiff's facts do not sustain equitable tolling of the KADEA time period.  Delaware fashions a strong argument for the plaintiff being unable to show equitable tolling of that state claim.  Even so, Delaware waited until its reply brief to discuss the court's prior order and to advance this new argument for revisiting the ruling.  In this district, courts are disinclined to consider issues raised for the first time in a reply brief. *Niles v. American Airlines, Inc.*, 563 F. Supp. 2d 1208, 1213 (D. Kan. 2008). The court will not address this argument in this summary judgment proceeding as it has not been timely presented.  Delaware, however, is not barred from raising this argument at trial.

On summary judgment, the initial burden is with the movant to point out the portions of the record which show that the movant is entitled to judgment as a matter of law. *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied*, 506 U.S. 1013 (1992). Instead of disproving a claim or defense, the movant need only show "a lack of evidence" on an essential element. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). If the movant meets that burden, the non-movant must come forward with specific facts based on admissible evidence from which a rational fact finder could find in the non-movant's favor. *Id.* The non-movant's "burden to respond arises only if the" movant meets its initial burden of production. *Neal v. Lewis*, 414 F.3d 1244, 1248 (10th Cir. 2005) (citation omitted). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether the evidence is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. at 251–52. Put another way, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *See Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009).

In applying this standard, all inferences arising from the record must be drawn in favor of the nonmovant.  *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003).  Credibility determinations and the weighing of the evidence are jury functions, not those of a judge.  *Id.* at 1216.  Nevertheless, "the nonmovant must establish, at a minimum, 'an inference of the existence of each element essential to [her] case.'"  *Croy v. COBE Laboratories, Inc.*, 345 F.3d 1199, 1201 (10th Cir.2003) (quoting *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir.1994)).

**Statement of Facts**

Delaware is an assisted living facility that hired Womack in the late summer of 2008 to work as a licensed professional nurse with some supervisory responsibilities.  Delaware terminated Womack on March 10, 2009, providing her with a written notice signed by Dawn Gates, as Delaware's director of nursing, and Mike Warren, as Delaware's administrator.  The notice stated:  "Due to your continued inability to cooperate with the Director of Nursing and follow direction and chain of command we are terminating your employment with Delaware Highlands effective 3-10-09."  (Dk. 57-6, p. 2).

In January of 2009, Delaware introduced to staff its new director of nursing, Dawn Gates.  The record reflects the working relationship between Gates and Womack was poor, and the reasons behind that problem

6

are controverted questions of material fact that preclude summary judgment.

Womack has testified that at the meeting when Gates was introduced to staff and over the span of the next week or so, Gates made several age discriminatory comments to her.  The first comment occurred at the meeting when Gates whispered to Womack that she did not want anyone over the age of 40 working for her because those over 40 would tell her how to do her job.  Later that day, Gates asked Womack to join in her office and then confronted her with "if you're not in my corner, you're against me." When Womack seemed confused, Gates explained that she did not want people over the age of 40 working there, because she did not want to be told how to do her job and because the hallways were long and she wanted younger women.  Womack says she reported Gates' comment to Warren who acted as if he was not concerned and told Womack that was a nursing issue she needed to discuss with her new supervisor.

Womack testified to a third conversation that occurred in Gates' office.  Gates told Womack that Pat Larson, a nurse, was "lazy, her legs are too old" and that Gates needed younger people running the facility.  When Womack pointed out that this is age discrimination, Gates became "livid" and said, "I can do what I want when I want."  (Dk. 57-2, Womack Dep. p. 151). Finally, Womack recalled Gates saying that their work relationship was "not

going to work" if Womack was not with her in terminating the old employees.  Womack repeated her position that she believed it was wrong to terminate people because of their age.  Womack said she reported all four comments by Gates to both Delaware's administrator Mike Warren and to Warren's supervisor, John Martin.  With Warren, Womack reported the comments as they were made, but with Martin, Womack reported them in a telephone call and repeated them during her meeting with Martin and Warren in late February.  Warren has testified that Womack did not come to him with any report nor told him that Gates had made these age discriminatory remarks.  The defendant objects to Womack's testimony about Gate's comments as inadmissible hearsay.  The court will address this objection later.

Delaware has a different perspective about the poor working relationship between Gates and Womack.  As Delaware's administrator, Warren said that Gates came to him with complaints that Womack was making derogatory comments about her to other nursing employees.  Warren investigated this complaint speaking with some of the charge nurses and other nursing employees.  Warren learned that a few employees had heard Womack say that Gates was a "tyrant" who wanted "to clean house" in the nursing department.  (Dk. 51-2, p. 38).  Warren, however, did not

take any action after his investigation and did not speak with Womack.

Warren did share with Gates the results of his investigation.

Warren recalled that Gates came to him several times

"express[ing] her frustration with trying to help Tonya fit into her position."

(Dk. 51-2, p. 40).  On one occasion, Gates complained that Womack had

questioned her decision on something, so Warren spoke with Womack.

According to Warren, Womack said she did not care for Gates' managerial

style and approach to discipline, so Warren encouraged Womack to

cooperate as Gates was working to improve quality.  Warren said the

"bickering" between Gates and Womack continued such that he concluded

they were unable to work together as director and assistant.  *Id.* at p. 48.

Within her authority as director of nursing, Gates issued

corrective actions against Womack and submitted them to Warren for his

approval.  On February 11, 2009, a corrective action was issued for

"continuing to yell" at an employee who was being terminated and who had

directed a statement to Womack.  Womack apologized to Gates explaining

she had lost her temper when the employee called her "a liar."  (Dk. 51-3, p.

2).  Another written warning was issued for Womack on February 11, 2009,

for instructing another nurse to ignore a physician's order to take a

urinalysis sample.  Womack gave a written reply to this corrective action

explaining that she and the other nurse were thinking that the weekly UA

9

had already been collected but that she did not order the nurse to not take the sample but left the decision to the other nurse on whether to take it.

A corrective action notice dated February 25, 2009, was issued by Gates.  This notice first describes the incident in these terms:  "Tonya chose to have resident be put on hospice without any care plan meeting between day shift charge nurse and director of nursing" and then summarizes in a separate page Gates' investigation of this incident.  (Dk. 51-5, pp. 2-3).[3]  The notice states that Womack contacted or was contacted by a representative of a particular hospice provider and then gave the representative the name and family contact information for a resident who Womack apparently believed was in need of hospice and additional care.  *Id.* This resident, however, was under doctor's orders for a physical therapy evaluation.  The family became quite upset that Delaware had facilitated this contact from a hospice care provider without discussing it with them first, particularly when the family did not believe such care was needed.  The notice also states that this hospice care provider admitted she comes to Delaware and visits with Womack and "occasionally other nurses to ask specifically what residents need hospice so she can contact their families." (Dk. 57-5, p. 3).  The notice further details that:

---

[3] The notice described the prior corrective action as:  "Tonya informed night nurse that collecting a UA was not necessary even though a Dr. had ordered."  (Dk. 51-5, p. 2).

> Tonya has been told numerous times that all nursing decisions must include the day shift nurse and with myself.  The reason for this is that as a group we are to make decisions together as Tonya does not provide the ongoing direct patient care.  A care plan meeting is necessary in these situations. The steps to be followed are to meet as a staff, plan the intervention, contact the family and then obtain a doctors order for hospice.  We then need to present the family with a minimum of three hospice groups that they then can call and meet with themselves to decide which one to use.

(Dk. 57-5, p. 3).  On the front of the corrective action notice, Gates included these written comments:

> Tonya has been instructed several times previous to make certain all decisions in regards to orders and 3rd party to be discussed with day shift charge nurse and DON [director of nursing].  Due to these incidents, you are being relieved of Med. Records/Staffing Coordinator duties.

(Dk. 51-5, p. 2).  The notice also has the box checked with the following warning:  "If this incident is repeated, further corrective action may be taken, which may include final written warning or discharge."  *Id.*  The notice has the signatures of Gates and Warren, but on the employee's signature line there appears, "refused to sign."  *Id*.

Despite the language used in the written corrective action, there is no question here that a nurse lacks the authority to put a resident on hospice without orders from the resident's physician.  Womack testified that she did not transfer or admit the resident to hospice care and agreed it would be a serious violation for a nurse to make this transfer without a doctor's order and the family's consent.  About this particular event,

11

Womack testified that she did the following.  She was contacted by a hospice representative and made a note in the resident's file that a hospice worker would be in to evaluate the resident on February 19.  Womack further testified that hospice representatives spoke with other nurses too and that it was the custom and policy at Delaware for a hospice evaluation to be requested by a charge nurse, the director of nursing or the administrator. Warren testified that Delaware, at the time of this event, had no formal specific policy on contacts with hospice workers and the related issues of confidentiality and HIPAA ("Health Insurance Portability and Accountability Act").

In his investigation of this incident, in particular the HIPAA problem, Warren interviewed the patient's son who had decision-making authority over the patient's healthcare, interviewed another nurse who had knowledge about this event, interviewed the hospice worker who was involved, reviewed the patient's medical records showing the plaintiff's entry regarding hospice, and spoke with a state official about the HIPAA matter. Warren concluded that Womack had committed "a major HIPAA violation by providing" to the hospice worker "personal confidential information about a resident without the resident or the family's approval."  (Dk. 51-2, p. 57). Warren did not investigate to determine whether Womack's actions were consistent with the practice there, as Warren believed that it was "Nursing

101" to know this practice was against the state law and HIPAA.  *Id.* at p.

72.  Warren did not talk with Womack during his investigation, as he had

concluded she had been untruthful with him in past investigations.

During Warren's investigation of this incident, Womack had a

meeting with Warren and Warren's supervisor, John Martin.  She brought up

the topic of Gate's discriminatory comments on age, Martin said he would

take care of the situation.  Womack noticed that Warren "became very

angry" and then began pointing out the corrective actions that had been

taken against Womack.  (Dk. 57-2, p. 154).

When she was fired on March 10, 2009, Womack was given a

written notice signed by Gates and Warren that stated:  "Due to your

continued inability to cooperate with the Director of Nursing and follow

direction and chain of command we are terminating your employment with

Delaware Highlands effective 3-10-09."  (Dk. 57-6, p. 2).  According to

Warren, Gates drafted the termination notice.  Warren testified he wanted to

fire Womack for the HIPAA violation in providing confidential medical records

to the hospice worker.  When asked why it was decided to terminate

Womack, Warren said "due to all of these issues that had been going on."

(Dk. 57-1, p. 114).  As to who decided to terminate Womack, Warren

testified on this topic several times:

Q.  Was it your decision then to terminate Miss Womack?

13

A.  No. It was Dawn Gates' decision with my approval after the investigation. We talked a long – we talked a great deal about this.
Q.  When did you talk about that?
A.  On the phone.  Miss Gates wasn't in the building, I don't think, at the time this happened. I believe this was when she was at home under medical leave.  That's why it took so long to finally address it, because she wasn't available to come in, and I wasn't going to terminate her employee.
Q.  So when you said immediate termination, that wasn't—
A.  No. That was –
Q.  –actually true?
A.  That's a – no.  I mean, I made the decision to terminate her at that time, immediately at that time, but it didn't happen until Miss Gates was back in the building.
Q.  But I thought it was Miss Gates' decision to terminate Miss Womack?
A.  Yes.  It was a joint decision that we made on the phone as we discussed the investigation.  (Dk. 57-1, pp. 73-74).

Q.  It was Miss Gates' ultimate decision to terminate Miss Womack, as I believe you testified; is that right?
        MR. BUCHANAN:  Misstates his testimony.
A.  It was a joint decision when we discussed it, yes.
Q. (By Mr. Lanterman)  Okay. And you—
A.  I agreed, yes.
Q.  Okay.
A.  She said, "We need to terminate her," and I agreed, yes, that, yes, we do.
Q.  Okay.
A.  It was joint decision made together, yes.
Q.  And I believe you said Miss Gates really didn't have to come to you; she had the final say on the staff that worked underneath her?
A.  She had to come to me for approval of any discharges.
Q.  Okay.
A.  Only for approval purposes only.  (Dk. 57-1, pp. 123-24).

**Objections to Womack's Testimony on Gates' Comments**

        In its reply brief, Delaware objects to Womack's testimony about

Gate's comments as inadmissible hearsay arguing that Warren, not Gates,

14

was the decision-maker in terminating Womack and, therefore, Gates'
comments are not admissible as opposing party admissions.  Calling this
objection a new argument, Womack seeks leave to file a surreply brief to
address this objection.  (Dk. 65).  The defendant opposes the plaintiff's
motion and addresses the merits of what the plaintiff argues in her attached
surreply memorandum.  (Dk. 66).  The court grants the plaintiff's motion for
leave and considers the merits of what the parties argue in their proposed
filings.

A statement offered against an opposing party is not hearsay, if
it "was made by the party's agent or employee on a matter within the scope
of that relationship and while it existed."  Fed. R. Evid. 801(d)(2)(D).  The
rule in this circuit is that "for a statement to qualify as an admission of a
party opponent, the speaker 'must be involved in the decisionmaking
process affecting the employment action involved.'"  *Jaramillo v. Colorado
Judicial Dept.*, 427 F.3d 1303, 1314 (10th Cir. 2005) (quoting *Aliotta v. Nat'l
R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003)).  Delaware says it
is uncontroverted that "Warren made the decision to terminate Plaintiff upon
the conclusion of his investigation into the hospice issue."  (Dk. 64, p. 12).
Warren's testimony in this regard, however, does not rule out Gates being
"involved in the decisionmaking process" to terminate Womack.  Instead,
Warren's other deposition testimony quoted above recognizes that Womack's

15

termination was a "joint decision" by him and Gates.  They made the decision together.  Gates drafted and signed the written notice of termination.  Because Gates supervised Womack, Warren recognized that Womack was Gates' employee and it was her decision to terminate with his approval.  Thus, there is sufficient evidence that Gates was involved in the decisionmaking process.  Delaware's hearsay objection is overruled.

**Prima Facie Case of Retaliation**

On a claim of retaliation[4] in which the plaintiff is relying exclusively "upon indirect evidence to avoid summary judgment . . ., the courts employ the burden-shifting framework of *McDonnell Douglas*, under which the plaintiff bears the initial burden of establishing a *prima facie* case." *Mathew v. Denver Newspaper Agency LLP,* 649 F.3d 1199, 1210 (10th Cir. 2011) (citation omitted).  A *prima facie* case of retaliation requires the plaintiff to show "that (i) [s]he was engaged in protected activity, (ii) [s]he suffered an adverse employment action, and (iii) there was a causal connection between the protected activity and the adverse action." *Id.* (citing *Timmerman v. U.S. Bank*, 483 F.3d 1106, 1122-23 (10th Cir. 2007)).

To the plaintiff's prima facie case, the defendant limits its challenge to the first element.  The defendant vaguely argues that what the

---

[4] *McDonnell Douglas* framework is applied to retaliation claims under both ADEA and KADEA.  *Spicer v. RadNet, Inc.*, 2011 WL 2148651 at *9 (D. Kan. May 31, 2011); *Garcia-Paz v. Swift Textiles, Inc.*, 873 F. Supp. 547, 559 (D. Kan. 1995).

plaintiff alleges to be Gates' comments are no more than "stray remarks or ambiguous comments" made by someone over the age of 40 that show a "personal grievance" or "personal opinion" and "not an unlawful employment practice." (Dk. 51, p. 12).  The defendant further contends, "[m]ore importantly, Plaintiff never informed Warren or Martin that Gates made these alleged comments."  *Id.*  For its legal authority, the defendant cites only the proposition that the employee's "'communications to the employer sufficiently conveyed[ed] the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.'"  *Id.* (quoting *Garcia-Paz v. Swift Textiles, Inc.*, 873 F. Supp. 547, 560 (D. Kan. 1995).

The plaintiff points to her testimony that she informed Warren of Gates' comments at different times and then met with Warren and Martin in late February and again discussed Gates' comments at that time.  When she reported these comments, the plaintiff recalls always being told they would be addressed.  The plaintiff argues that those comments cannot be dismissed as a "personal grievance," because Gates was the director of nursing with the authority to carry out her age bias.  (Dk. 57, p. 18).  The plaintiff contends:

> Ms. Gates expressed a desire to get rid of the older employees and bring in younger ladies who would not question her authority.  This was a pattern and practice of discrimination.  Ms. Gates was in a

position to fire employees.  Her personal opinion aside, Ms. Gates was actively discriminating on the basis of age.

(Dk. 57, p. 18).  The plaintiff's memorandum offers no citation, reference or explanation in support of that last quoted sentence.

The respective statutes prohibit discrimination against an employee who "has opposed any practice made unlawful by this section." 29 U.S.C. § 623(d) (ADEA); K.S.A. § 44-1113(a)(5) (who "has opposed any practices or acts forbidden under this act or has filed a complaint, testified or assisted in any proceeding under this act.").  "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [anti-discrimination statutes]." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).  "To satisfy the first element of the prima facie case, the employee must do more than conclusorily incant that [sh]e is protesting age discrimination." *Maxey v. Restaurant Concepts II, LLC*, 654 F. Supp. 2d 1284, 1296 (D. Colo. 2009). "Protected opposition can range from filing formal charges to voicing informal complaints to superiors." *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004) (citation omitted).  Protected opposition must be against a "'practice made an unlawful employment practice.'"  *Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir.2009) (quoting *Petersen v. Utah Dept. of Corrections*, 301 F.3d 1182, 1188 (10th Cir.2002) ("Title VII does not

18

prohibit all distasteful practices by employers.")).  Protected opposition can be based on a reasonable, although mistaken, good faith belief that the protested action violated the anti-discrimination law.  *Crumpacker v. Kansas Dept. of Human Resources*, 338 F.3d 1163, 1171 (10th Cir. 2003), *cert. denied*, 540 U.S. 1180 (2004).

"General complaints about company management and one's own negative performance evaluation will not suffice," unless they are tied to a discriminatory motive and practice.  *Hinds*, 523 F.3d at 1203.  Complaining about a co-worker's isolated racial slur is not protected opposition, as no reasonable person would believe it violated discrimination statutes.  *Robinsn v. Cavalry Portfolio Services, LLC*, 365 Fed. Appx. 104, 113-14, 2010 WL 447000 (10th Cir. 2010) (citing *Jordan v. Alternative Resources Corp.*, 467 F.3d 378, 380 (4th Cir. 2006), *cert. denied*, 549 U.S. 1362 (2007)).  On the other hand, a plaintiff's opposition to a supervisor's discriminatory comment "has been considered sufficient to constitute the opposition to a discriminatory employment practice required to establish the initial prong of a retaliation claim."  *Loggins v. Cleveland County*, 2005 WL 2318606 at *6 (W.D. Okla. 2005) (citing *Alexander v. Gerhardt Enterprises, Inc.*, 40 F.3d 187, 195 (7th Cir. 1994); *Rowland v. Franklin Career Services, LLC*, 272 F. Supp. 2d 1188, 1207 (D. Kan. 2003));  *see Domai v. Discover Financial Services, Inc.*, 244 Fed. Appx. 169, 174, 2007 WL 1723610 (10th Cir.

19

2007).  ("[A] credible complaint about a supervisor's racial animus could constitute protected opposition to discrimination . . . .").  "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication" virtually always "constitutes the employee's opposition to the activity." *Crawford v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 555 U.S. 271, 276 (2009) (citations omitted).

The plaintiff's testimony concerning Gate's comments can be understood to show them to be more than offhand or personal comments that no reasonable person in the workplace would believe to be unlawful discrimination.  Arguably, Gates made these comments as the director of nursing to her assistant disclosing her plans for replacing current nursing staff with younger employees and warning Womack that their working relationship would suffer if she resisted Gate's plans.  Womack testified that she not only openly opposed these plans to Gates herself but reported Gates' comments to her superiors.  There is no factual dispute that Gates and Womack had a strained working relationship.  On the current record, the court cannot say as a matter of law that a reasonable person in Womack's position would not have believed that Gates' plans and warnings as stated in the four comments were not age discrimination.  Moreover, there are questions of material fact on whether Womack reported Gates' comments to

Warren and Martin.  Defendant is not entitled to summary judgment on this issue.

**Pretext in Employer's Reasons for Termination**

Upon the plaintiff making out a prima facie showing of retaliation, the defendant employer "'has the burden of coming forth with a legitimate, nondiscriminatory reason for adverse action.'"  *Hennagir v. Utah Dept. of Corrections*, 587 F.3d 1255, 1265 (10th Cir. 2009) (quoting *Butler v. City of Prairie Village, Kan.*, 172 F.3d 736, 752 (10th Cir. 1999)).  If the employer meets that burden, then it shifts back to the plaintiff to show pretext which requires a showing that the proffered nondiscriminatory reason is "unworthy of belief."  *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010).

The defendant has come forward with evidence that Womack was terminated for her inability to work with Gates, for her poor performance and misconduct as evidenced by the corrective action notices, and for her HIPAA violation.  Characterizing these instances as serious misconduct warranting termination, the defendant has articulated legitimate, nondiscriminatory reasons for terminating Womack's employment.

To create a controverted fact issue on pretext, "the plaintiff must present evidence of temporal proximity plus circumstantial evidence of retaliatory motive."  *E.E.O.C. v. Picture People, Inc.*, ---F.3d---, 2012 WL

2755916 at *6 (10th Cir. Jul. 10, 2012). The plaintiff "must produce evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Argo v. Blue Cross and Blue Shield of Kansas*, 452 F.3d 1193, 1203 (10th Cir. 2006) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). "As a general rule, an employee must proffer evidence that shows each of the employer's justifications is pretextual," but a reasonable factfinder may reject generally the employer's credibility when the plaintiff's evidence "casts substantial doubt on many of the employer's multiple reasons." *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1126 (10th Cir. 2005) (internal quotation marks and citations omitted). To determine whether a proffered reason for a decision is pretextual, the court examines the facts as they appeared to the person making the decision to terminate, not as they appeared to the plaintiff. *Sarkar v. McCallin*, 636 F.3d 572, 576 (10th Cir. 2011). "[T]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Id.* (internal quotation marks and citation omitted).

The plaintiff comes forward with sufficient evidence to create a genuine issue as to pretext.  First, the plaintiff points to the inconsistencies in the reasons stated in the termination notice and those stated by Warren in his deposition testimony.  Warren's testimony arguably suggests the plaintiff's termination was directly tied to his investigation in the plaintiff's HIPAA violation, and yet this reason does not appear in the written notice.  This omission happened despite Warren signing the notice of termination and also specifically instructing Gates to "make certain we have all our ducks in a row" with regards to documenting Womack's termination.  (Dk. 57-1, pp. 115-16).  An employer's inconsistent or changing reasons for termination that are not reasonably explained can raise an inference undermining the employer's credibility as to the real reasons for terminating an employee.

As far as the HIPAA violation, the plaintiff testified to what she did in scheduling a hospice referral as being the custom and practice at Delaware and that other nurses discussed such matters with hospice workers too.  Warren admitted that at the time of this hospice incident there was no formal policy in place regarding contacts with hospice workers and the related issues of confidentiality and HIPAA.  Warren also admitted that he did not investigate whether Womack's actions conformed to the custom and practice at Delaware or whether other nurses were engaged in the same

23

conduct. The plaintiff argues these circumstances suggest that by terminating the plaintiff on this ground, the defendant acted contrary to the unwritten policy and practice being followed by other nurses who were not terminated for similar conduct.

Finally, the plaintiff points out that Warren and Gates issued a corrective action notice for the hospice incident that relieved of her "Med. Records/Staffing Coordinator duties" and that warned, "If this incident is repeated, further corrective action may be taken, which may include final written warning or discharge." (Dk. 51-5, p. 2). Despite the express terms of the notice, the defendant says it terminated the plaintiff days later based largely on this same incident without any further occurrences or incidents of misconduct. The plaintiff argues these circumstances show her termination was contrary to the written terms of her disciplinary notice.

There is sufficient evidence from which a reasonable jury could rationally find that the defendant's stated reasons for termination are unworthy of credence and could infer a retaliatory motive because of the defendant's inconsistent and changing reasons given for termination, the defendant's lack of a formal HIPAA policy on the hospice referrals, the defendant's failure to investigate and enforce consistently the unwritten policy and practice on hospice referrals, the defendant's contradiction of its own corrective action notice, and the temporal proximity between the

plaintiff's protected opposition and her termination.  The defendant is not entitled to summary judgment on this claim.

**Punitive Damages**

In response to the defendant's motion for summary judgment, the plaintiff "withdraws" her claim for punitive damages under the KADEA. (Dk. 57, p. 22).  Because the plaintiff does not formally oppose the defendant's motion, the court shall grant summary judgment as to this claim for punitive damages.

**Location of Trial and Assignment of Case**

The pretrial order specifies the parties' preference for trial in Kansas City, Kansas.  The case will be reassigned for trial in Kansas City.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment (Dk. 50) is granted as to the plaintiff's claim for punitive damages and is denied in all other respects.

IT IS FURTHER ORDERED that the plaintiff's motion for leave to leave to file a surreply brief (Dk. 65) is granted, and that the court has considered the merits of what have been argued in the plaintiff's attached filing and in the defendant's opposing memorandum (Dk. 66).

Dated this 1st day of August, 2012, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge

25